**SMITH et al. v. TURNER.  (No. 2176.)**

Court of Civil Appeals of Texas.  El Paso. Dec. 20, 1928.

Rehearing Denied Jan. 17, 1929.

Claude Pollard, Atty. Gen., Wright & Gibbs, of San Angelo, Turney, Burges, Culwell & Pollard, of El Paso, Rex G. Baker, of Houston, Harris, Harris & Sedberry, of San Angelo, W. L. Dean and Hiner & Pannill, all of Fort Worth, James Cornell and Glenn R. Lewis, both of San Angelo, Ike S. Handy, of Houston, Bland Proctor, of Fort Worth, A. M. Gee and J. C. Adams, both of Tulsa, Okl., Belcher & Montague, of Del Rio, Leon L. Mott and A. D. Dyess, both of Houston, R. R. Priest, of Rankin, Koerner, Fahey & Young, of St. Louis, Mo., and Lea, McGrady, Thomason & Edwards, of El Paso, for appellants.

Cantey, Hanger & McMahon, of Fort Worth, and Gossett & Collard, of Odessa (Mark McMahon and Gillis Johnson, both of Fort Worth, of counsel), for appellee.

Hill, Smith & Neill, of San Angelo, for I. G. Yates.

HIGGINS, J. This suit was brought by appellee, Turner, in the district court of Pecos county, against A. N. Lea, county surveyor of said county. The action was brought under article 5323, R. S., for mandamus, to compel the surveyor to make a survey as required by said article' of certain parcels of land, hereinafter particularly described, in Pecos county, alleged to be unsurveyed public free school land, which the petitioner desired to purchase. It was alleged that plaintiff previously had made written application of inquiry to the Commissioner of the General Land Office and the Commissioner refused to recognize the existence of a vacancy and give the name of an authorized surveyor to make the survey. All of the conditions precedent to the right to bring the suit are by the petition and evidence shown to have been met. The surveyor answered, averring a willingness to make the survey if ordered so to do, and impleaded numerous adverse claimants of the land in question. Among those so impleaded are Mrs. M. A. Smith and I. G. Yates. These last-named parties and those claiming under them will be hereinafter, respectively, referred to as the Smith interests and the Yates interests.

In response to a peremptory instruction given upon the close of the evidence, verdict was returned finding the land described in the petition to be "vacant, unsurveyed land belonging to the Public Free School Fund of the State of Texas." Thereupon judgment was rendered that all of the lands and areas described in the petition "are and the same are

hereby adjudged to be vacant, unsurveyed public land belonging to the Public Free School Fund of the State of Texas, to wit: [Here follows description of the land,] and that such vacant public land above described is not included in or appropriated by either the Ira G. Yates Survey of Pecos County, Texas, or in any of the surveys in either Block 194, G. C. & S. F. Ry. Co. Surveys of Pecos County, Texas, or Block 178, T. C. R. R. Co. Surveys, Pecos County, Texas, or in any other survey; and that the said claimants and each of them impleaded herein are without any right, title, or interest in and to said area or any part thereof."

The judgment then proceeded to order the surveyor to forthwith make the survey and within 90 days do the other things required by the second section of the act, and the writ of mandamus against the surveyor was ordered issued as prayed for.

From this judgment the surveyor did not appeal. Some of the impleaded claimants did not appeal. Many of them, however, did appeal, giving cost bonds, including Mrs. Smith and various parties claiming under her.

Appellee moves to dismiss the appeal upon two grounds, viz.: First. Because the judgment is not appealable. Second. Because the questions presented by the action and determined by the judgment have become moot.

In support of the second ground, attention is called to the fact that appellants did not supersede the judgment appealed from, and by affidavit and attached exhibits it is satisfactorily shown to this court that since the rendition of the judgment the surveyor Lea had obeyed the judgment and mandatory writ issued against him, and the land in question had been applied for by appellee, awarded by the Commissioner of the General Land Office, and patented to him by patents issued by the Governor based upon the survey made and field notes returned by such surveyor.

Mrs. Smith and husband conceded the facts just stated to be true and that the questions at issue had been thereby rendered moot, but objected to the dismissal of the appeal. In their reply to the motion the Smiths show that since the appeal was perfected Turner has filed an action in trespass to try title to the land in question in which they had answered and filed cross-action. Certified copies of the petition, answer, and cross-action in the trespass to try title suit were attached to the reply. The Smiths objected to dismissal upon the ground that such action would leave the judgment of the lower court in effect and res judicata of the questions determined by the judgment; therefore the Smiths insist that the questions at issue had become moot, but to avoid the judgment from later operating as res judicata the same be vacated, and judgment here rendered dismissing the suit without prejudice, as was done in McWhorter v. Northcut, 94 Tex. 86, 58 S. W. 720.

The other appellants resist the motion of Turner as well as that of the Smiths and insist the appeal be considered and disposed of upon its merits.

Article 5323, R. S., authorizes actions such as here presented. It reads:

"Unsurveyed School Lands.—The rules governing the sale of unsurveyed school lands are:

"1. *Application.*—One desiring to purchase any portion of the unsurveyed land believed to belong to the school fund shall make a written application of inquiry to the Commissioner. The inquiry shall give the applicant's post-office address, state in effect that he desires to buy the land if it is for sale and sufficiently designate it. If it appears from the records of the Land Office that the area belongs to the public free school fund, or if there be doubt as to the existence of the area as public free school land, the applicant shall be advised and given the name and address of an authorized surveyor with whom he may contract for the survey of the land at the expense of the applicant. The applicant shall file an application with the surveyor accompanied by one dollar as a filing fee. The application shall be filed and recorded and sufficiently describe the land. The survey shall be made and returned to the Land Office within ninety days after the date of the Commissioner's advice as to an available authorized surveyor.

"2. *Suit to require survey.*—If the Commissioner declines to recognize the existence of the area as public school land and refuses to authorize a survey to be made, such person may file suit against the county surveyor in the district court of the county in which the land is located, or in the county to which such county may be attached for judicial purposes, to compel him to make the survey and thereupon the surveyor shall implead the claimant of the land and in such proceedings determine if the area be public land. In such proceedings the surveyor shall not be held for any cost incurred. If the final judgment of the court should decree the area or part thereof to be school land the surveyor shall make the survey, and the application, field notes and one dollar filing fee shall be filed in the Land Office within ninety days from the date of the final decree.

"3. *Classification.*—When the surveyor returns the field notes and a plat of the survey to the Land Office, together with one dollar filing fee to be paid by applicant, he shall report under oath the classification and reasonable market value of the land and also the timber thereon and its value, which may be considered in connection with such other evidence as may be required by the Commissioner in determining the price to be given for the land and timber. If upon inspection of the papers the Commissioner is satisfied from the report of the surveyor and the records of the Land Office that the land belongs to the

public free school fund and the survey has been made according to law, he shall approve the same by classifying and valuing the land, and mail notice of such action to the applicant, giving the classification, price and terms.

"4. *Terms of sale.*—Any timber on such land shall be sold for cash at its reasonable market value. No award shall be issued for the land until the timber shall have been fully paid for. The applicant shall file in the Land Office his application for the purchase of the land together with one-fortieth of the appraised value fixed thereon within sixty days from the date of the notice of the classification and valuation, together with the applicant's obligation for the balance of the unpaid purchase price bearing interest at the rate of five per cent. per annum, and the obligation and other conditions of sale shall be the same as that for surveyed land. If such application should not be filed within the time prescribed herein, the Commissioner shall place the land on the market for sale upon the same terms as are herein provided for other surveyed school land. If upon the inspection of any application, field notes and records of the Land Office, there should appear to be a greater area belonging to the school fund than that included in the application and field notes, the Commissioner may, in his discretion, require the applicant to include the whole area in his field notes. If it appears that another than the applicant claims an unsurveyed area which belongs to the school fund, the Commissioner may, in his discretion, refer the removal of such claim to the Attorney General before making a sale to an applicant. The Commissioner may sell the area though the Attorney General refuses to institute proceedings for the removal of such claim."

The first ground of Turner's motion to dismiss is based upon the theory that the court proceeding provided by the second section of article 5323 is "a special jurisdiction and authority of an administrative or ministerial character, and the decree provided for therein is neither final nor appealable" in the absence of an express right of appeal conferred, which the act does not give.

This view is untenable and the cases cited have no application.

By the first section of the act, one desiring to purchase unsurveyed land believed to belong to the school fund must first apply to the Commissioner of the General Land Office.

By the second section, if the Commissioner declines to recognize the existence of the described area as public school land and authorize a survey to be made, such person may file suit in the district court against the county surveyor to compel him to make the survey, and the surveyor shall implead the claimant of the land *and in such proceedings determine if the area be public land. If the final judgment of the court should decree the area or part thereof to be school land, the surveyor shall make the survey.*

■ Now, under the first section, the duty imposed upon the Commissioner is administrative and to some extent discretionary. His action one way or the other binds no one in the final determination of the issue of vacancy. If he grants the application and subsequently awards the land after the survey is made, the issue of prior vacancy must be thereafter determined in a suit by or against any adverse claimant. The question is then the usual one arising upon conflicting grants.

■■ If the Commissioner refuses to take the action authorized by section 1, then the applicant may resort to court action. If the applicant takes such action, he is then before a tribunal vested with the judicial function and empowered to judicially determine and settle finally, as between the one who asserts the right to purchase and the adverse claimant, the question of whether or not the alleged vacancy exists and the land public school land. That is exactly what the second section undertakes to do by requiring the adverse claimant to be impleaded, and as a condition precedent to ordering the survey to be made the court must determine and decree that the land in question is public free school land. And that is the effect of the judgment here rendered. In our opinion, the judgment as between the parties to this litigation is res judicata of the issue of vacancy. Thompson v. Locke, 66 Tex. 383, 1 S. W. 112. If this judgment be affirmed, that issue cannot be successfully injected into any subsequent litigation between these parties respecting the land. The suit and the judgment rendered vitally and finally affects the title asserted by the adverse claimant and is appealable, under article 2249, R. S., which gives the right of appeal from every final judgment of the district court in civil cases.

This conclusion is strengthened by the fact that, in three proceedings under the act, three Courts of Civil Appeals have assumed appellate jurisdiction and decided the cases upon their merits. Anderson v. Polk (Tex. Civ. App.) 291 S. W. 1112; Id. (Tex. Sup.) 297 S. W. 219; Maxcy v. Boyles (Tex. Civ. App.) 258 S. W. 229; Lomax v. Rowe (Tex. Civ. App.) 3 S.W.(2d) 499.

In the first case cited the Supreme Court also assumed jurisdiction.

■ In those cases the appealable nature of the judgment seems not to have been questioned, but in every case appealed and decided upon its merits the appellate court impliedly holds that the case is appealable.

■ What has been said as to the character of the action and the effect of the judgment controls the second ground of Turner's motion. Action or inaction on the part of the Land Commissioner cannot in any degree affect the character of the court proceeding

authorized by the act, nor the judicial nature and effect of the judgment authorized and rendered in this case.

The action of the surveyor in making the survey and reporting the same to the Land Office, of the Land Commissioner in approving the report and awarding the land to Turner and the issuance of the patents, has but intensified the situation as to appellants by further beclouding the title adversely claimed by them, and investing Turner with sufficient evidence of title upon which to base an action of trespass to try title, which action he has in fact begun against the Smiths.

If this appeal be dismissed, the judgment of the lower court would remain in effect, and the action of trespass to try title would be a perfunctory proceeding necessarily resulting in judgment in Turner's favor in so far as the issue of vacancy is concerned. Thompson v. Locke, supra. The motion to dismiss the appeal is overruled.

As to the suggestion of Mrs. Smith that the judgment be vacated and the suit dismissed without prejudice, such an order would eliminate any question of res judicata in the now pending, or later filed, actions of trespass to try title. But the suit authorized by the second section of the act provided a statutory action to judicially and finally determine, as between the plaintiff and the adverse claimants, the issue as to whether there is an unsurveyed area belonging to the public free school fund. The district court in such a suit cannot rightfully decline to determine this question, nor can this court do so upon appeal. Those appellants who are insisting upon a final determination of the appeal upon its merits have the right to insist that the case proceed to its ultimate conclusion in the appellate court and the question finally decided for or against them upon its merits, which will now be done.

As showing the appellee's theory of a vacancy, pertinent portions of his petition, omitting preliminary averments showing compliance with the conditions precedent to the maintenance of the suit and refusal of the Commissioner to recognize the vacancy and authorize a survey, are as follows :

5.

"Plaintiff alleges that such area, the purchase of which has been heretofore applied for as aforesaid, and which it is now sought that the defendant, as County Surveyor, shall be directed to survey, is described as follows:

"Being all of that unsurveyed land and area situated in Pecos County, Texas, about 57 miles East from Fort Stockton, the County seat of Pecos County, Texas, and about three miles West of the Pecos River, lying and being situate between the eastern boundaries of Surveys 33, 32, 31, and 30, Block 194, G. C. & S. F. Ry. Co. Surveys of Pecos County, Texas, and a portion of the Eastern boundary of Survey 1, Block 178, T. C. R. R. Co. surveys of Pecos County, Texas, on the West; and the western boundaries of the Ira G. Yates survey of Pecos County, Texas, and a portion of the Western boundary of survey 61, Block 1, I. & G. N. R. R. Co. Surveys of Pecos County, Texas, on the east; the North end of which unsurveyed area is the most northerly south line of survey 33, said Block 194, and a projection thereof toward the east to an intersection with the west boundary of said Survey 61, Block 1, I. & G. N. R. R. Co. surveys of Pecos County, Texas; and the south end of which is the projection in an easterly direction of the North line of survey 35, Block 178, T. C. R. R. Co. surveys, from the intersection of such projected line with the east boundary of Survey 1 in said last named block to its intersection with the western boundary of the Ira G. Yates Survey of Pecos County, Texas, at a point due east of the northeast corner of said survey 35 in said Block 178; and containing approximately 560 acres of land, more or less; and the configuration of which said vacant area may be generally described as a series of eight and a fraction rectangular areas in stairstep position, the widths of which by east and west measurement being approximately between 400 and 500 varas, being approximately 425 varas wide across the north end of the vacant area herein sought to be surveyed, and approximately 508 varas wide across the south end of such area; and each of such rectangular areas being approximately 950 varas in length by north and south measurement and the whole series of which, lying between the respective eastern and western boundaries of the blocks of surveys heretofore mentioned, being a little more than four miles long in north and south measurement, the general course of which is in a northwesterly and southeasterly direction, approximately parallel to the course of the Pecos River."

6.

"Plaintiff alleges that the blocks of surveys and surveys in this vicinity from the Pecos River, west, are located as follows:

"Block 1 of the I. & G. N. R. R. Co. survey is made up of a series of system of surveys, the eastern boundaries of which adjoin the west bank of the Pecos River.

"That the next survey west of said Block 1, is the Ira G. Yates survey.

"That on the West of the Western boundary of the Ira G. Yates survey and a portion of the Western boundary of survey 61, Block 1, I. & G. N. R. R. Co. surveys and adjoining such western boundaries, as hereinbefore described, is the vacant and unsurveyed area above described.

"That on the West of the vacant and unsurveyed area above described lies Block 194, G. C. & S. F. Ry. Co. surveys, and particularly Surveys 1 to 34 thereof, and that the east-

ern boundaries of Surveys 33, 32, 31 and 30 of said Block 194 adjoin said vacant and unsurveyed area along its western boundary line.

"That immediately south of said Block 194 there is located Block 178, T. C. R. R. Co. surveys, and particularly survey 1 thereof, the eastern boundary of which is the north portion of the eastern boundary of such Block 178 and that the eastern boundary of said survey 1, Block 178, adjoins the western boundary of the most southern portion of the vacant area above described.

"That west of surveys 1 to 34 of said Block 194, Block Z of the T. C. R. R. Surveys is located, the eastern boundary of which adjoins the western boundaries of surveys 1, 6, 5, 7, 12 and 13 of Block 194.

"Plaintiff alleges that each of said blocks mentioned are separate and independent blocks and systems of surveys, run out and established in different years for the holders of different certificates, and that within each of the several independent blocks of surveys, the surveys were each established as part of a continuous system making up such block.

"That the Ira G. Yates survey is a separate and independent survey from all of the other blocks and surveys mentioned and was located more than twenty-five years after any of such other surveys, and in or about the year 1921, and has been patented according to said field notes to the said Ira G. Yates, by patent issuing from the State of Texas on April 30, 1927."

### 7.

"Plaintiff alleges that the eastern boundary of the Ira C. Yates Survey is definitely located by the monuments now and continuously since its survey, found and identified on the ground as called for in its field notes and in the patent aforesaid, which are the only corners which can be identified by objects called for in the field notes of such survey; and that such eastern boundary lines and corners are the only lines and corners in which any physical, natural or artificial objects are called for in said field notes and patent and that it contains 2,486 acres of land; and that its western boundary was at the time it was located and surveyed, and at the time it was patented, and continuously since such time, and is at the present time an open, unmarked prairie line, located according to its metes and bounds, as set out in its said field notes and patent, by course and distance from its said eastern boundary, which latter boundary contains the nearest known corners on the ground; and that no natural, physical or artificial objects are called for in any of the lines and corners along the western boundaries of such survey by either the field notes or patent thereof.

"Plaintiff alleges that this western boundary of the Ira G. Yates Survey, as aforesaid, in fact fails to reach and adjoin any of the corners and lines of the Eastern boundaries of Surveys 33, 32, 31 and 30 of Block 194, G. C. & S. F. Ry. Co. surveys and the eastern boundary lines of survey 1, Block 178, T. C. R. R. Co. surveys, failing to reach and meet the same by more than 400 varas being the width in east and west measurement of the vacant area hereinbefore described, and all calls which were contained in the field notes and patent of the Ira G. Yates survey for adjoinder with the corners and lines in the east boundary lines of the surveys in Block 194 and Block 178, just mentioned were inserted as the result of a mistake, and upon conjecture and misapprehension by the surveyor making such Yates survey as to the location of the true eastern boundaries of these two eastern blocks, and said surveyor mistakenly believed the location of such eastern boundaries of Block 194 and Block 178 to be more than 400 varas east of their true locations and positions which said eastern boundaries were at all of the times mentioned herein open unmarked prairie lines, the boundaries, lines and corners of which were at such time and for a long time prior thereto fluctuating and uncertain.

"Plaintiff alleges that Block Z and particularly the surveys along the east boundary line thereof and the east line of such block is and was at all of the times mentioned herein, definitely located on the ground by monuments in said block found and identified on the ground, as called for in its original field notes; the plaintiff alleges that Block 194, and particularly surveys 1 to 34 thereof, was surveyed, constructed and located on and adjoining the east lines of Block Z from the west toward the east from surveys 1 to 34, inclusive, by continuous and interconnecting calls and that the east lines of surveys 30, 31, and 32 of said Block 194 were at all of the times mentioned herein and are now located at the course and distance from the east line of Block Z as called for in the respective field notes of said interconnecting surveys in Block 194, and that the east line of survey 33, Block 194, was at all of the times mentioned herein and is now located at the course and distance called for in its corrected field notes and the course and distance calls contained in the field notes of other surveys in said block lying west of it with which its calls connect, from the west line of Block Z toward the east; and that as so located and according to the true position of the eastern boundaries and corners of said block 194, the same do not adjoin the western boundaries of the Ira G. Yates survey and in fact are and were at all of the times mentioned herein located more than 400 varas west of the western boundaries of the Ira G. Yates Survey."

### 9.

"Plaintiff alleges that the calls contained in the original field notes of Surveys 30, 31,

32, 33 and 34 of Block 194, for their east lines and corners to adjoin the western lines and corners of surveys in Block 1, I. & G. N. R. R. Co. surveys, were inserted by mistake and upon misapprehension and conjecture as to the location of the lines and corners called for as adjoinders and in fact the east lines of said surveys in Block 194 were located and constructed at distances which varied from approximately two-thirds of a mile to a mile and a half west and approximately two-thirds of a mile south of the western lines and corners of the surveys in Block 1, of the I. & G. N. R. R. Co. Surveys with which they called to adjoin, and the same being open, unmarked prairie lines, which left a large vacant area of unsurveyed school land between said blocks of surveys prior to the establishment of the Ira G. Yates survey; and that this error in calls for adjoinder and the existence of such large vacancy was recognized by the Land Commissioner and the Land Office and the State of Texas and by all claimants to land in and around said area, and the Ira G. Yates survey was located and patented as aforesaid, in the area between said blocks of surveys, but occupies and takes up only the eastern portion thereof, leaving still vacant the area applied for as hereinbefore described."

### 10.

"Plaintiff alleges that all of the lines and corners in the blocks of surveys lying both north and south of said Block 194, being respectively the Runnels County School land and Block 178, T. C. R. R. Co. surveys, with which the surveys in Block 194 call to adjoin are open, unmarked prairie corners and lines of indefinite and uncertain location, and that in fact said Runnells County School Land lies more that one-half mile to the north and east of any of the lines and corners in Block 194, and that a number of vacant areas have already been recognized by the Land Commissioner, The Land Office and the State of Texas, and by all claimants to the land in and around said area, and that the east line of surveys 30, 31, 32, 33 and 34 are and were at all of the times mentioned herein, located, following the footsteps of the original surveyor, in said Block course and distance from the known corners and known east line of Block Z (which are the nearest known corners) from the west toward the east and that, as correctly located, there exists the vacant area which plaintiff is seeking to purchase and which it is now sought to require defendant to survey.

"Plaintiff alleges that no other surveys or blocks of surveys adjoin said Block 194 and the Ira G. Yates survey except as stated and that since the original surveys of said blocks and surveys, no resurveys or corrected field notes nor patents have been issued on or in any of same which change or purport to change or relocate the position, area and dimensions of said blocks and surveys and which change or purport to change or relocate the position, area or dimensions of surveys 30, 31, 32 and 33, of Block 194 and of the Ira G. Yates survey from those herein stated and particularly with reference to the relative locations of the eastern boundaries of Block 194 and the western boundaries of the Ira G. Yates Survey, but the same remain with the vacant area above described separating them and that the true location of such respective boundaries are not and were not at any of the times mentioned herein, in any other or different position from that as heretofore stated."

### 11.

"Plaintiff alleges that by reason of the facts above recited, the Commissioner of the General Land Office, was in error in declining to recognize the existence of the area hereinbefore described as public school land and in refusing to authorize a survey to be made thereof, and is mistaken as to the respective locations of the eastern boundary of surveys 30, 31, 32 and 33, Block 194, G. C. & S. F. Ry. Co. surveys, and the east boundary lines of survey 1, Block 178, T. C. R. R. Co. surveys, and as to the true locations of the western boundary lines of the Ira G. Yates survey and as to the actual distances on the ground, both East and West, North and South, through the blocks of surveys hereinbefore described, as has been and can be shown by actual survey and measurement correctly made, and all of which the survey herein sought to be required to be made by the defendant, A. N. Lea, as County Surveyor, will more fully reveal.

"Plaintiff alleges that the unsurveyed area which he seeks to purchase and which is now sought to be officially surveyed by the County Surveyor, does not infringe upon or diminish any of the adjoining surveys or blocks or surveys, and that the title to the same is and has always been in the State of Texas, and for which land the State of Texas, has never been paid, and that each and all of the owners of surveys and portions thereof in the surveys and blocks surrounding such vacant area, will have all of the lands and area for which they have ever paid the State of Texas and all of the lands and area for which their respective field notes and patents call, and are in no position to complain."

The theory of the Smith interests will appear in the course of the opinion. Suffice it to say here that, in so far as concerns the boundary issue as to the land claimed by them, and by the plaintiff claimed to be unsurveyed, the contention of the Smith interests is that such land is embraced in surveys owned by them on the east side of block 194, G. C. & S. F. R. R. Co., and block 178, T. C. R. R. Co.

The theory of I. G. Yates as to the bound-

ary issue is shown by this portion of his answer, viz.:

"For further and especial answer herein defendant denies that plaintiff, in this action for a mandamus to require the survey as prayed for in his petition, can litigate with defendant in this cause the issue of a survey and measurement on the ground to determine whether any unsurveyed land exists between the surveys therein mentioned, and he avers that the records, field notes, maps and files of the General Land Office show that no unsurveyed land exists in the area plaintiff seeks to have surveyed, but that the said area as disclosed by the records, maps and field notes in the General Land Office of Texas, is appropriated by other surveys and not unsurveyed school land.

"Defendant avers that believing certain lands situated in the Eastern part of Pecos County, Texas, lying between the Western or back lines of River Sections 63 to 51 in Block 1, I. & G. N. Railway Company in plaintiff's petition mentioned, and the Eastern lines of Surveys 1, Block 178, T. C. Railway Company, and 30, 31, 32 and 33, and other lands in Block 194, G. C. & S. F. Railway Company, in said petition mentioned was unsurveyed school land and desiring to purchase it, if it was, defendant made written application of inquiry to the Commissioner of the General Land Office as provided by law, who referred him to R. S. Dodd, a licensed land surveyor, to make a survey and return field notes of said area, and thereafter, about May 13, 1920, he filed his application with said surveyor for a survey of said area beginning at the Southwest corner of Section 107, Block 194, G. C. & S. F. Railway Company, and running East along the South lines of Sections 101, 102, 103, 104, in Block 194, to River Survey 63, Block 1; Thence in a Southerly direction along the lines of Sections 63, 62, 61, 60, 59, 58, 544, 643, 55, 53, 54, 52, and 51, Block 1, to the Southwest corner of said 51; Thence West with extension of the Southerly line of 51 to Section 1 in Block 178; Thence Northwest along the lines of Section 1, Block 178 and Sections 30, 31, 32, 33 and 34 to the Northeast corner of Section 34, Block 194; Thence following the North lines of Sections 34, 35, 36 and 37, to Section 38, Block 194; Thence North to the place of beginning.

"That thereafter the said R. S. Dodd surveyed said area lying between the back or West lines of the I. & G. N. Railway Company surveys in Block 1, aforesaid, and Surveys 33, 32, 31 and 30, Block 194, G. C. & S. F. Railway Company and survey 1, Block 178, T. C. Railway Company as containing 2486 acres designating it as S. F. 12341, I. G. Yates, and returned the field notes thereof to the Land Office; that said field notes were duly approved by the Land Office and notice thereof given and land classified 'mineral grazing'; and appraised at $2.00 per acre; that this defendant filed his application for the purchase of said land as provided by law and the same was awarded to him June 7, 1921, and thereafter patented to him on April 30, 1927, a copy of which patent is hereto attached marked 'Exhibit A' and made a part hereof. He avers that the field notes returned by said surveyor and incorporated in said patent of said land is bounded on the West by the East lines of said surveys 33, 32, 31 and 30, Block 194, G. C. & S. F. Railway Company and a portion of Survey 1, Block 178, T. C. Railway Company and thereby all of the land lying to the East of said surveys 33, 32, 31 and 30, and 1, aforesaid, is a portion of said survey S. F. 12341 in the name of I. G. Yates and that if said survey contains acreage in excess of the 2486 acres called for in said patent the same is not unsurveyed but excess land.

"This defendant further avers that in making inquiry of the Commissioner of the General Land Office as aforesaid and his application to the surveyor with whom he was advised by said Commissioner to contract for the survey thereof, it was his intention and purpose to acquire all of the unsurveyed land lying between the back or West lines of the surveys in Block 1, I. & G. N. Railway Company aforesaid and the Eastern boundary line of Surveys 33, 32, 31 and 30, in Block 194, G. C. & S. F. Railway Company and survey 1, Block 178, T. C. Railway Company aforesaid; that in making the survey and return of field notes of said area it was the intention and purpose of said surveyor to include within the boundary of said field notes all of the unsurveyed land lying between the block and surveys aforesaid; that in the approval of said field notes by the Commissioner of the Land Office it was his purpose and intention to incorporate and include in said survey S. F. 12341 I. G. Yates all of the unsurveyed land lying within the area between said block and surveys aforesaid; that at the time of this defendant's application to purchase said survey S. F. 12341 he in good faith relied upon the survey made by said surveyor with his field notes approved by the Commissioner of the Land Office as containing 2486 acres and as including all of the land lying between said block and surveys aforesaid; that he had no knowledge or notice at the time of his application to purchase as aforesaid and at the time of paying the purchase money to the State for said land, that it did not include all of said area; and that he accepted his patent in good faith so relying implicitly upon the survey and field notes' as made by the surveyor to whom he had been referred and that he would not have accepted same had he not so relied, as he had a right to do; and that he thereafter continued to rely upon said approved field notes as set out in the patent aforesaid, containing within

their boundary all of the unsurveyed land lying between said blocks and surveys aforesaid; and has been in adverse possession thereof since the date of his said purchase and if there be any land within the area described in plaintiff's petition and claimed by him, the same is not vacant unsurveyed land but is excess land belonging to this defendant and part of said survey S. F. 12341 I. G. Yates, and that if there is any excess acreage in said land over the 2486 acres which he paid for this defendant is now and has been at all times ready, able and willing to pay such for excess and has requested of the Commissioner of the Land Office a resurvey of said Survey S. F. 12341 in the name of I. G. Yates, for the purpose of having the acreage therein corrected and to surrender his patent and have it reissued, incorporating therein any excess acreage which might be found upon a resurvey thereof."

The land involved in the litigation is in the Yates oil field, and numerous holders of mineral rights are among the impleaded claimants. Some of them claim under Mrs. Smith and husband; others, under Yates; some claim under both Mrs. Smith and Yates.

Block 1, I. & G. N. R. R. Co. survey, was surveyed in December, 1876. This survey is bounded upon the east by the Pecos river. The surveys therein will be collectively referred to as the river surveys. In this block are two surveys, Nos. 543 and 544, which were surveyed for the H. & G. N. R. R. Co. These last two mentioned surveys lie between I. & G. N. survey No. 55 on the south and I. & G. N. No. 58 on the north. The I. & G. N. surveys are numbered from the south to the north. I. & G. N. No. 55 lies immediately south of 543. I. & G. N. No. 58 lies immediately north of 544. The river surveys each run about a mile west from the river. The west line of the block is irregular. To locate the same it was necessary to run course and distance from established corners upon the river.

The Runnels county school land lies considerably north of the alleged vacancy. It was originally surveyed in 1881 and corrected in 1882 by L. W. Durrell. It lies west of and adjoins river surveys Nos. 64 to 69, inclusive.

Several miles south of the alleged vacancy and extending west lies block A2, T. C. R. R. Co. survey, which was surveyed in May and June, 1881, by H. C. Barton. North of and adjoining block A2 lie blocks C3, E. L. & R. R. Co. survey, and block C4, G. C. & S. F. R. R. survey. Block C4 lies west of and adjoins block C3. The last two mentioned were surveyed in 1881 by H. C. Barton, C3 in June, and C4 in October.

Block 178, T. C. R. R. Co. survey, was surveyed by said Durrell in November, 1882. It was an office survey. It lies north of and adjoining blocks C3 and C4.

In November, 1882, block Z, T. C. R. R. Co., was surveyed by G. Shadousky. It is north of and adjoins block C4. The two southern tiers of surveys in block Z lie west of and adjoin block 178. The southeast corner of this block is established and identified by bearings. Its true location is not in dispute. This is known as the Perry Hill corner. From this corner the east line of the block runs north 8 miles. Its north line runs thence west. Four miles west of said northeast corner is a common corner of two of the surveys in block Z. This corner is known as the Canyon corner. It is established and identified by its bearings. Its true location is not in controversy. By running course and distance from the Perry Hill and Canyon corners, the east line of block Z can be located.

At this time there remained an unsurveyed area bounded on the east by the river surveys, on the south by block 178, on the west by block Z, on the north in part by the Runnels county school land. The school land did not extend far enough west to connect with block Z.

With this situation existing said Durrell, as deputy for H. C. Barton, county surveyor, in May, 1883, located block 194, G. C. & S. F. R. R. Co. survey. It was an office survey. Survey 1 of this block lies east of and adjoins survey 15 in the northeast corner of block Z.

The field notes of survey 1, block 194, read:

"Beginning at a stake and mound at the Northeast corner of Survey No. 15, Block Z for the northwest corner of this survey;

"Thence South 1900 varas to a stake and mound at the Southeast corner of said survey No. 15; Block Z for the Southwest corner of this survey;

"Thence East 1900 varas to stake and mound for the Southeast corner of this survey;

"Thence North 1900 varas to rock mound for the northeast corner of this Survey;

"Thence West 1900 varas to place of beginning."

Upon survey 1 Durrell constructed field notes for the succeeding surveys in block 194, but in the southern tier of surveys (Nos. 13 to 20, inclusive, and 29 and 30) he called for connections with corners of the northern tier of surveys, in block 178. Surveys 30 to 34, inclusive, constitute the eastern tier of Durrell's survey in block 194, and in the field notes of these surveys he called for adjoinders with the west lines and corners of the river surveys. This eastern tier in block 194 lies west of the river surveys Nos. 54, 55, 543-544, 58-59, 60, 61, and 62.

By giving controlling effect to said adjoinder calls, surveys 30 to 34, inclusive, would cover all of the unappropriated land between block Z on the west and the river surveys on the east. The result would be a large excess in acreage in surveys 30 to 34.

About three years after the field notes of block 194 had been returned ·to the General Land Office, the Commissioner of that office undertook to change the field notes of surveys 30, 31, and 32 by having lines drawn through the calls for adjoinder with the corners and lines of the I. & G. N. surveys in block 1, and thus upon the records of his office eliminated those calls. The calls for the corners and lines of H. & G. N. surveys 543 and 544 were not thus deleted, evidently through error.

At apparently the same time the Commissioner on November 19, 1886, wrote a letter to the county surveyor of Pecos county, which reads:

"This is to notify you that all calls for I. & G. N. R. R. Co. Surveys have been stricken from the field notes of Surveys Nos. 29, 30, 31 and 32, Block 194, in Pecos County, by virtue of Certificates Nos. 3984 and 3987, G. C. & S. F. Ry. Co., and to request you to make like changes in your record of said field notes, and notify this office when you have done so, in order that said Surveys may be patented."

It will be noted this letter gave no instruction to delete the calls for the H. & G. N. surveys 543 and 544, but some of those calls were deleted by the county surveyor and some were not.

We need not follow in detail the intricacies and confusion of the field notes of surveys 30, 31, 32, and 33, after the deletions were made upon the records of the General Land Office and the county surveyor.

It was an evident attempt by the Commissioner to tear surveys 30, 31, 32, and 33 apart from all of the river surveys. Whether this purpose was legally effected or not we need not attempt to determine and do not decide. It injects a conflict of interest between the Smith interest and the Yates interests, discussion of which is to be avoided for reasons later stated.

For the present purpose it may be assumed the deleted calls in the field notes of the eastern tier of surveys in block 194 were lawfully eliminated and those surveys thereby torn apart from all the river surveys. In any event the Land Commissioner so assumed, and as a consequence also assumed that the east lines of surveys 30, 31, 32 and 33 were fixed by their course and distance calls and an unsurveyed vacancy thus left between the east lines of those surveys and the west lines of the river surveys.

Yates subsequently became the owner of surveys 30 and 32. Mrs. Smith subsequently became the owner of surveys 31 and 33. Mrs. Smith also became the owner of survey 1, block 178, T. C. R. R. In this situation and evidently acquiescing in the assumption by the Commissioner of the vacancy indicated, Yates, owning a ranch in which the assumed vacant and unsurveyed area lay, applied to the Commissioner of the General Land Office for a survey thereof and to purchase the same under the law then in force.

With reference to this application of Yates, the record discloses the following:

"(a) Letter from I. G. Yates dated May 1, 1920, addressed to the Commissioner of the General Land Office, as follows:

"'Fort Stockton, Texas, May 1, 1920.

"'Hon. J. T. Robison, Commissioner General Land Office, Austin, Texas. Dear Sir: The accompanying inquiry and application to buy the land shown therein is the same land that I have been trying to acquire through the Surveyor's office here, and through the land office in Austin, for about three years. On Feb. 26th, 1920, your office wrote me a letter, in answer to my letters of Feb. 4th and 19th, 1920, in reference to a tract of vacant land in the Eastern part of the County of Pecos, describing the land in said letter the same as shown in my application herewith, and in this letter of yours it is stated that the file was rejected for reason of irregularities in the field notes. As explained to me, while in your office a few days prior to this letter of Feb. 26th, and in this letter I was advised that if I desired to purchase the land in question, should make a new application to the County surveyor, as provided in Section 7, approved April 3rd, 1919. In pursuance with these instructions I filed with the County Surveyor, A. N. Lea, this county, the application as prescribed in your letter; which is of record manifest in this office, and in making my application I used the application blank that I obtained from your office while there about Feb. 4th. This application blank is headed "Application for Survey—L. P. Form 7," and addressed to County Surveyor, and no doubt was prepared carefully by your office so that persons situated like me could make a proper and legal application. I made this file as before stated with the Surveyor here, and paid the filing fee at the time.

"'I am now informed by Mr. L. L. Farr, of San Angelo, in a letter dated April 23rd, that I make this application that I am sending you; that is an application of inquiry, also a letter from Mr. R. L. Dodd, surveyor, to Mr. Farr, in which he states that he had taken the matter up with the drafting department, your office, about this vacant strip, but he states that field notes sent in·from Pecos county were evidently incorrect and that new field notes should be made by Mr. Yates and Mr. Holmes. He also advises that I write the Commissioner, under this law of April 3rd, 1919, asking for a survey, and that you would name a proper surveyor to whom I should make the application, and this surveyor so named could then return the field notes to the land office and the purchaser be notified and could complete his purchase. He also stated that he had just had an application from Mr. Holmes. I have tried, on various occasions to have a survey made, and have followed, as nearly as possible all instructions and advices in the matter, including the

last file mentioned, four files or applications for this survey. I therefore, wish you would kindly take this matter up at once and designate a surveyor to whom I can make this application, providing you hold that my application, made March 3rd, is not good.

"'I have just returned home from Roswell, New Mexico, where I have been detained for the past two weeks, on a civil action in the district court, and hence my not taking this up with you earlier after the receipt of letters from Farr and Dodd.

"'Yours truly,        I. G. Yates.'"

"(b) Letter dated May 1, 1920, addressed to J. T. Robison, Land Commissioner, signed by I. G. Yates, as follows:

"'Fort Stockton, Texas, May 1st, 1920.

"'Honorable J. T. Robison, Commissioner General Land Office, Austin, Texas. Dear Sir: Under and by virtue of Article 5432, Acts of the Regular Session 36th Legislature, and approved April 3rd, 1919, I herewith make a written application of inquiry to the Commissioner, General Land Office. My post office address is Fort Stockton, Pecos County, Texas, where I reside, and I desire to buy the following described land; that is, vacant land in the Eastern part of Pecos County, lying between Survey 107, Blk 194, G. C. & S. F. Ry. Co., and running East to River Survey No. 63, thence following the back lines of surveys 63, 62, 61, 60, 59, 58, 544, 543, 55, 54, 53, 52 and 51, thence from the southwest corner of 51 west to section 1, Block 178 T. C. R. R. Co., thence in a northerly direction with East lines of surveys in Block 178 to Section 30 in Block 194, thence west to No. 31, 32, 33 and 34 and thence westerly with 35, 36 and 37 and north along the line of 38 to the beginning.

"'Yours truly,        I. G. Yates.'"

"(c) Letter dated May 8, 1920, from J. T. Robison Land Commissioner, signed by him, addressed to I. G. Yates, Fort Stockton, Texas:

"'May 8, 1920.

"'Mr. I. G. Yates, Fort Stockton, Texas. Dear Sir: I am in receipt of yours of the 1st inst. relative to vacant land in the eastern part of Pecos County lying between the I. & G. N. R. R. Co. surveys, block 1 and G. C. & S. F. R. R. Co. surveys block 194 extending northward up to and along the south boundary of Runnels County school land. This application covers the same territory as your inquiry of February 19th which was answered on February 25.

"'Mr. J. M. Holmes of Sheffield filed on that portion of this vacancy from the north line of I. & G. N. R. R. Co. survey 542, block 1, northward to a line running eastward from the northeast corner of survey 35, block 178, T. C. R. R. Co. This application was answered March 19th. Your application which was answered February 25th covers that portion

of this large vacancy north of a line described in same as running west from the southwest corner of section 51, I. & G. N. R. R. Co., to section 1, block 178, T. C. R. R. Co., thus conflicting north and south about two miles with said Holmes inquiry. You will note therefore that your inquiry received on February 4th is twelve days earlier than that of Mr. Holmes of February 16th, which as stated above was answered on March 19th.

"'Inasmuch as an applicant has ninety days from the date of answer to his letter of inquiry in which to send to this office his application and field notes, you still have seventeen days from the date of this letter in which to furnish this office field notes of all the area embraced in said inquiry of February 25th. However, if you cannot furnish same within seventeen days your rights then would be fixed by your inquiry on May 1st, under which you would have ninety days from the date of this letter to return application and field notes. However, if you file on land under your last inquiry and Mr. Holmes submits application and field notes within ninety days from March 19th, you have to correct out of conflict your field notes to the extent of the area described in his inquiry, which will hold you to a south boundary line for your tract which is the north boundary line of the Holmes file to a line extending eastward from the northeast corner of said section 35, T. C. R. R. Co., Block 178.

"'For the purpose of making field notes or survey of this tract or tracts described in your letter of May 1st, you are hereby referred to Capt. R. S. Dodd of Alpine, Texas.

"'You should refer to section 7, chapter 163, page 315, Acts of the 36th Legislature and be guided by the provisions therein set forth for further procedure to acquire this vacant land.

"'Yours truly,
        "'J. T. Robison, Commissioner.
"'Blucher/FLB'"

"(d) Application for survey signed by I. G. Yates, dated June 8, 1920, as follows:

"'Application for Survey.

"'Application No. ———.

"'To ——— County Surveyor of ——— County, Texas, or to R. S. Dodd, District Surveyor of ——— Land District:

"'By virtue of Section 7 of an Act approved April 3, 1919, I hereby apply for a survey of the following described unsurveyed land appropriated to the Public Free School Fund under Chapter 11, Act February 23, 1900, to-wit:

"'Situated in Pecos County, Texas, about sixty miles South & East from the County site. Said tract is bounded as follows: Beginning at southwest corner of Section 107, Block 194, G. C. & S. F. Ry. Co., and running east to river survey 63, Block 1, along the southern lines or lines of section 101, 102, 103,

104 in Block 194, thence in a southerly direction along the lines of section 63, Block 1, 62, 61, 60, 59, 58, 544, 643, 55, 54, 53, 52, 51, and to the southwest corner of 51, thence straight west with southerly line of 51, to section 1, in Block 178, thence northwest along the line of sections 1, Block 178, 36, 30, 31, 32, 33, and 34, to the northeast corner of section 34, block 194, thence, following the northwest line of section 34, 35, 36, 37 to section 38; thence in a northerly direction to place of beginning in Block 194. (N. B.—Write name and P. O. address distinctly) I. G. Yates, Applicant, P. O. Fort Stockton, Texas. Received & filed in my office May 13th, 1920, 9 o'clock A. M. Alpine May 13, 1920 R. S. Dodd, Lic. Lnd. Sur.

" 'I, R. S. Dodd, Licensed Land Surveyor of ——— Land District, hereby certify that the above and foregoing application No. ——— was filed for record on the 14th day of May 1920, at 3 o'clock P. M. and recorded in Vol 35, pages 11 and 12 in the office of county surveyor Pecos County, Texas.

" 'June 8, 1920.

" 'A. N. Lea, Co. Sur. Pecos County. Land Office S. F. No. 12341—Application for Survey—Filed June 14, 1920, J. T. Robison, Land Commissioner. Phillips, Clerk.' "

The conflicting applications of Yates and Holmes, referred to in the Commissioner's letter of May 8th, were adjusted by written agreement between Yates and Holmes evidenced by letter signed by them, addressed to A. N. Lea, county surveyor, which reads:

"This is an agreement between J. M. Holmes and I. G. Yates on filing for vacant lands laying between their river surveys and back surveys;

"We agree that you shall prepare applications to give J. M. Holmes all vacancy laying south of a straight line commencing at SW corner of Survey 51 running straight to NE corner of survey 35, and give I. G. Yates all land North and East of said land and J. M. Holmes all land south and west of said line. This is an agreement by and between both of us and we affix our signatures to same."

"(f) Letter addressed to J. T. Robison, signed by R. S. Dodd, licensed Land Surveyor, as follows:

" 'Alpine, Texas, May 13, 1920.

" 'Hon. J. T. Robison, Commissioner General Land Office, Austin, Texas. Dear Sir: In accordance with the application of I. G. Yates, received May 13, 1920, for a survey of a certain tract of unsurveyed land in Pecos County, Tex. made to me as Licensed Land Surveyor under authority of your letter of May 8, 1920, referring Mr. Yates to me for a survey of said tract of land, duly described in his application and in your letter, I enclose field notes of a survey made by me of the land in question, duly recorded in the County Surveyors Office of Pecos Co. in which the land is situated.

" 'The actual survey was made on the ground by me as State Surveyor, determining and marking the lines of adjacent surveys, and duly reported to your office, and the field notes of that survey are adopted for the enclosed field notes.

" 'The tract of land covered by these field notes is very rough grazing land, No Water, No Timber, and its market value as compared with lands in the vicinity; would, in my judgment, be $1.50 per acre. Respectfully, R. S. Dodd, Licensed Land Surveyor.' "

Dodd, who is now dead, surveyed the alleged vacancy as shown by above letter, and returned field notes thereof as required by law, which were later corrected, returned, and then approved by the Commissioner of the General Land Office.

Letter from Land Commissioner which reads:

"General Land Office.

"Austin, Texas, May 11, 1921.

"Mr. I. G. Yates, Fort Stockton, Texas. Dear Sir: Your application to the County Surveyor of Pecos County for a survey of land under Section 8 of the Act of April 15, 1905, together with the field notes for Survey No. ——— Block No. ——— 2486.0 acres, has been examined and the field notes approved.

"The land is classified as Min & Graz and valued at $2.00 per acre, and is subject to sale to you upon the following terms, to-wit:

"For cash or one-fortieth cash with 5% on the deferred principal and without condition of settlement and improvement and with the right to pay same out at any time and obtain patent. If you want to buy the land for cash you should make your application accordingly and send to this office the full cash payment for the land and a patent fee of $34.00 and recording fee of $1.00. These fees should be sent separately from the remittance for the land. If you want to buy the land on time, then you should make your application and obligation accordingly and send same to this office with one-fortieth of the purchase price as the first cash payment.

"Enclosed herewith is a blank for application to purchase this land. To avoid delays, mistakes and correspondence you are urged to fill every blank space in making out this application to purchase. Under the law you will have *sixty days* from this date within which to file your application to purchase in this office.

"In writing about this matter please refer to S. F. No. 12341.

"Very respectfully,
"J. T. Robison, Commissioner."

By application dated June 2, 1921, Yates applied to purchase under act of April 3, 1919, chapter 163, the land surveyed by Dodd, and on June 7, 1921, the land was awarded to him by the Commissioner and later patented to him by patent dated April 30, 1927.

The corrected field notes of Dodd, upon which the patent issued, read as follows:

"Beginning at a rock set for the SW corner Sur 61 Blk 1 I & G N R Co. from which a rock mound bears East 184 vrs, from which mound East edge Caprock bears N 19° 25′ E, Boulder on point brs S 38° 30′ E;

"Thence North 268 vrs, Thence West 308 vrs to an E cor of Sur 33, Blk 194

"Thence South 950 vrs, Thence West 356 vrs to an E cor of Sur 33, Blk 194;

"Thence South 950 vrs, Thence East 1166 vrs to an E cor of Sur 33, Blk 194

"Thence South 285 vrs, Thence East 5 vrs to NE cor Sur 32 Blk 194

"Thence South 665 vrs, Thence East 1431 vrs to an E cor of Sur 32;

"Thence South 950 vrs, Thence East 1040 vrs to an E cor of Sur 31

"Thence South 950 vrs, Thence East 425 vrs to an E cor of Sur 30

"Thence South 950 vrs, Thence East 285 vrs to an E cor of Sur 30;

"Thence South 950 vrs, Thence East 400 vrs to NE cor Sur 1 Blk 178

"Thence South 950 vrs, Thence East 256 vrs to an East cor said Sur 1

"Thence South 597.5 varas to the intersection of the east line of sd sur 1 with a line from the SW cor Sur. 51, Blk 1, I. & G. N. Ry. Co. to the NE cor Survey 35; Thence S 44° 34′ E 2471 vrs to the SW cor said sur. 51, a rock mound on a narrow back bone, set on a large flat rock, from which foot of bluff bears S 58° E, Column of square boulders brs S 62° 30′ W. "SW 51" marked on flat rock brs N 70° E 2 Varas; Thence North 950 vrs. to NW 51, a rock mound from which bluff bears N 27° 47′ E, Cap rock brs N 19° 30′, W; Thence West 546 vrs to SW 52, rock mound from which sharp pk. brs S 4° 30′ E point of bluff brs S 55° 15′ E, a rock mound brs S 64° 30′ E 72 vrs; Thence North 950 vrs to NW 52, a rock mound from which Square Bldr. on pt. brs S 70° 50′ E White spot on bluff bears N 32° 05′ E, rock mound brs S 63° 30′ E 66 vrs; Thence West 564 vrs to SW 53, a rock mound on north slope of ridge, from which bluff bears N 10° 45′, about 500 vrs E edge caprock brs. N 11° 50′ W; Thence North 950 vrs to NW 53; Thence West 65 vrs. to SW 54; Thence North 950 vrs. to NW 54, rock mound on ridge, from which foot of rim brs. S 52° 30′ E Cap rock N 37° E; Thence West 216 Vrs to SW 55, rock mound on hill, "SW55" on flat rock brs E 1 vrs E edge Bluff brs S 22° W about 200 vrs, sharp top hill bears N 26° W; Thence North 950 vrs to NW 55, rock mound near edge of bluff, N edge cap brs N 50° E, point of brown spot on nose bears S 3° E; Thence West 311 vrs to SW543 set 3857 vrs west of original SE 543 on river; Thence North 988 vrs to NW 543; rock marked "NW543" bears west 89 vrs; Thence West 385 vrs to SW544, rock mound in flat brs West 89 vrs; Thence North 988 vrs to NW 544, rockmound in a valley bears West 89 vrs;

Thence W 445 vrs to SW58 rock mound on terrace bears west 89 vrs; Thence North 988 vrs to NW 58, rock mound in canyon bears W 89 varas; Thence West 947 varas to SW59, rock mound on N side of mountain near top bears W 89 varas; Thence north 988 vrs to NW 59, rock mound in flat brs W 89 varas; Thence West 1528 varas to SW 60, a rock mound on foot of ridge from which white spot on cap rock bears S 83° 30′ East projecting cap bears S 18° W; Thence N 988 varas to NW 60, rock mound on E slope of Canyon, from which X on a rock bears N 56° 30′ E 59 varas; Thence W 1171 varas to the place of beginning."

From what has been said it is apparent that when Dodd undertook to survey the land which Yates sought to purchase, it was necessary to locate the west line of the river surveys and the east line of block 194, the latter line being the east line of surveys 30, 31, 32, and 33. Both of these lines were unmarked, the line of 194 being obviously so in view of what has been said. Dodd located the west line of the river surveys by running course and distance west as called for in their field notes from established corners on the river. That he did this correctly is not questioned. He monumented and identified by bearings west corners of river surveys as called for in the east line of the land patented to Yates on April 30, 1927.

It was then necessary for him to locate the east line of block 194. This is how he did it as shown by his reports to the Commissioner of the General Land Office and on file in that office.

By his first report of progress it is shown that he located the east line of block Z and west line of block 194, by running course and distance from the Perry Hill and Canyon corners in block Z, and then went to the northwest corner of survey 5, block 194, which corner is upon the line mentioned and 2 miles south of the northeast corner of block Z. From the northwest corner of survey 5 (quoting from first report), he "ran East by course and distance to a point for N. E. Corner 34, Block 194, and on 4520 varas to a point on the West bank of the Pecos River."

"If above premises are approved this will be the true North line of surveys 37, 36, 35, 34 in Block 194, *and the point set by distance from east line, Block Z for N. E. 34, will be the N. E. Corner of Block 194 as called for in original field notes.*" (Italics ours.)

It is well to here mention that the northeast corner of 34 is about a mile north of the land in controversy.

From the above quotation it will be observed Dodd suggested and intended, subject to the Commissioner's approval, to locate the east line of block 194 by running course and distance from the common east line of block Z and west line of block 194.

The report deals at length with further preliminary surveying which Dodd had done, some of which was far to the south, and, up-

on information therein disclosed to the effect that he found some original corners in blocks C3 and C4 on the south, the Commissioner rejected Dodd's suggestion above shown and instructed him:

"(2) If there is excess east and west in surveys in Blocks C–3 and C–4 to which surveys in Blocks 178 and 194 tie, such excess should be accordingly given to surveys or tiers of surveys extending N. and S. through said Blocks 178 and 194.".

This instruction caused the present controversy, for in obedience thereto Dodd determined the location of the east and west boundary lines of the surveys in block 194, by projecting the lines north from surveys to the south located with reference to (quoting from second report) "a line of original corners running east and south from N. W. 3 C–4, through Block C–3 to N. E. Corner Survey 43, Block A–2, I was instructed to make the widths of Surveys 178 and Block 194, East and West, accommodate itself to the calls for these C–3 Surveys on South line of Block 178." The east line of surveys 33, 32, 31, and 30, as thus determined, lay east of the line if fixed by course and distance from the common line of blocks Z and 194 determined as Dodd originally suggested should be done.

Field notes of the vacancy were accordingly returned, subsequently corrected in an unimportant detail, and approved, the land awarded to Yates and later patented to him as above shown.

Dodd actually surveyed upon the ground the common line of the vacancy and the river surveys and established the monuments called for in his field notes to mark such line. But it was not necessary for him to actually run upon the ground the east line of block 194 determined in accordance with the Land Commissioner's instructions. By the preliminary surveying done Dodd knew that the east line of block 194, if located according to such instructions, was a certain distance west of the river surveys, and that it was 308 varas from the west line of river survey 61 to one of the interior east corners of survey 33, block 194. Accordingly, his first western call in the field notes of the vacancy is for 308 varas from a point in the west line of river survey 61 to an east corner of survey 33, block 194.

From this east corner of 33 his field notes for the west line of the vacancy call simply for course and distance and connections with corners of 33, 32, 31, 30, in block 194, and survey 1, in block 178. Not a monument was called for nor any bearings given which would identify and locate any of the corners called for. Dodd did not establish upon the ground any of the corners thus called for in the west line of the Yates tract.

The position of the appellee is that the common line of block Z and block 194 can be definitely located from the Perry Hill and Canyon corners, and the correct way to locate the true east line of block 194 (the survey of block 194 being an office survey) is to run the course and distance calls given in the field notes of block 194, and if so run such east line would be located about 425 varas west of where it would be located according to the method employed by Dodd under the instructions of the Land Commissioner.

Appellee's further contention is that the west line of Dodd's survey should be established by running course and distance (west 308 varas) from the west line of river survey 61 according to Dodd's field notes. This method of fixing the lines would leave a number of parcels of unsurveyed land, in the form of parallelograms, rising one above the other in stairstep fashion, with single corner connections, each tract being approximately 425 varas wide, east and west.

It may be conceded, and is assumed, that the true east line of block 194 should be fixed in the manner indicated, but for reasons to be now stated we cannot concur in the view that the west line of the land awarded and later patented to Yates should be located as contended for by appellee.

When the state makes a sale of its lands, its rights and those of its vendees, when not controlled by statute, are the same as those of vendor and purchaser as in the case of natural persons. Fristoe v. L. & H. Blum, 92 Tex. 76, 45 S. W. 998; Willoughby v. Long, 96 Tex. 194, 71 S. W. 545.

In Woods v. Robinson, 58 Tex. 655, Judge West said: "The rules for the construction of grants, and for ascertaining their boundaries, which have from time to time been announced by the court and have been acted on in establishing their lines, are all designed for the purpose of carrying out the intention of the grantor. *When this intention is once made manifest, all else must yield to and be governed by it.* Robertson v. Mosson, 26 Tex. 248; Swisher v. Grumbles, 18 Tex. 164." (Italics ours.) To the same effect are Robinson v. Doss, 53 Tex. 496; Boon v. Hunter, 62 Tex. 582; Welder v. State (Tex. Civ. App.) 196 S. W. 868; Ruth v. Carter-Kelly Lbr. Co. (Tex. Civ. App.) 286 S. W. 322.

This is but applying to conveyances of land that cardinal rule in the interpretation of all contracts; namely, to ascertain the intention of the parties and give effect thereto if it can be done consistent with the rules of law. While the boundary cases do not always upon their face show that the decision rested primarily upon the rule of giving controlling effect to the intention of the parties, yet in the last analysis it will be found that the decision in all cases was based upon that fundamental principle.

It frequently occurs that when the description of the boundaries of a grant consistent upon their face are attempted to be applied upon the grounds inconsistencies in the calls develop. In such cases controlling

effect is always given to the boundary call which will give effect to and carry out the intention of the parties, and the call inconsistent with and which will defeat that intention is rejected as a false call.

Such intention is to be ascertained upon the face of the grant, read in the light of the surrounding facts and circumstances. Boon v. Hunter, 62 Tex. 582; Huff v. Crawford, 89 Tex. 214, 34 S. W. 606; Stafford v. King, 30 Tex. 271, 94 Am. Dec. 304.

In the application of that doctrine, controlling effect is sometimes given to the calls regarded as the most reliable and therefore of higher dignity and importance. Again, course and distance, or distance alone, generally considered the most unreliable call of all, is given controlling effect. In some cases course and distance have yielded to calls for adjoinder with open unmarked prairie lines which could be located accurately. Again, calls for distance have yielded to calls for natural or artificial objects which have disappeared but the location of which was known and shown. The numerous cases upon the subject need not be cited.

It may be safely asserted that in every case where inconsistencies develop in the boundary calls of a patent or deed when such calls are attempted to be applied upon the ground, controlling effect has been given always to the calls which will carry the intention of the parties, when such intention has been ascertained in the light of the surrounding facts and circumstances.

In the present case, according to appellee's own theory, there was an area of unsurveyed, unappropriated land lying between the river surveys and block 194. In this situation Yates had the right to buy the vacancy upon compliance with the statutory provisions. It was the duty of the Commissioner of the General Land Office to sell the same to Yates after the land had been surveyed as by law required and compliance by Yates with the statutory provisions. In the subsequent events culminating in the award and patent to Yates, the Commissioner acted as the authorized agent of the state. The surveyor Dodd was the statutory agent to survey the land and return the field notes thereof.

The documentary evidence quoted above shows unmistakably that it was the intention of Yates to buy, and the Commissioner to sell, all of the land lying between the west line of the river surveys and the east line of block 194 and east line of survey 1, block 178, wherever those lines truly lay. From this conclusion no reasonable mind can dissent. The written evidence upon its face shows this, and it would be fantastic to even surmise that either of the parties contemplated that, after the transaction was closed, there would be left in the Yates ranch a number of unsurveyed tracts belonging to the state, lying and rising one above the other in stairstep fashion.

If controlling effect be given to the distance call from the west line of river survey 61 to an opposite east corner of survey 33, block 194, as appellee contends should be done, then the intention of the vendor and purchaser will be defeated. On the other hand, if the field notes be construed so as to give controlling effect to the call for connection with such corner and the calls for the other corners, in the eastlines of surveys 33, 32, 31 and 30 and line of survey 1, block, 178, then the intention of the parties is carried out.

Appellee's whole case rests upon the assumption that the true location of such east corners and lines of said surveys can be accurately and certainly determined, and in our opinion the calls for connection with such corners, wherever they may be found to be truly located, should prevail and the distance call rejected as a mistaken call.

Under the circumstances here shown, the error of the surveyor Dodd in determining the location of the east line of block 194 should not defeat the plain intention of the parties.

The general rules of law above stated do not warrant such holding, and in all the boundary cases in this state arising upon a similar state of facts the boundary calls were given a construction which would effectuate the intention of the parties.

Baker v. Light, 80 Tex. 627, 16 S. W. 330, is directly in point. The facts in that case are as follows: Longavilla survey No. 4 lay west of and adjoining the Martinez survey No. 104. The controversy involved a strip of land 1564 varas long and about 212 varas wide. In December, 1874, Von Roy conveyed to Light land described as follows:

"Being 400 acres, more or less, taken out of the southeast corner of survey No. 4 in the name of Francisco Longavilla. Said 400-acre tract is more particularly described and bounded as follows: Beginning at a stake set for the southeast corner of said survey No. 4; thence north 76 west 1446 varas to a stake set on the southwest boundary line of said survey No. 4 for the southwest corner of this tract; thence north 14 east 1564 varas to a stone set in the ground marked X for the northwest corner of this tract, from which a mesquite 15 inches in diameter bears north 28½ east 12 varas, do. 12 inches in diameter bears north 38½ east 25 varas, do. 12 inches diameter bears south 55½ east 18 varas; thence south 76 east 1445 varas to a stake set on the southeast line of survey No. 4 for the northeast corner of this tract; thence south 14 west 1564 varas to the place of beginning according to a survey made by T. C. Nelson, deputy county surveyor, November 24, 1874."

Baker claimed the strip under a subsequent deed from Von Roy, which covered the strip. The common boundary line between the two surveys could not be identified on the ground at the time Light bought. After

Light bought and before Von Roy conveyed to plaintiff, the dividing line between surveys No. 4 and No. 104 was established by agreement. The evidence showed that at the time he bought Light went upon the ground with a deputy county surveyor who surveyed the land Light was to buy. They ran course and distance as called for in the original field notes of 4, and drove a stake for the southwest corner of the Light tract. (C on the plat.)

"We then ran from the point c, where we had driven down the stake (continuing the course called for in said field notes of survey No. 4), 1445 varas to find the southeast corner of survey No. 4 aforesaid. When we had run out the course and distance we made a careful search for the southeast corner of survey No. 4 aforesaid, but could not find same nor any indication of its true locality. As we were running the said south or southwest line of survey No. 4 as aforesaid we found along the route we ran at various places old marked line trees. Not being able to find southeast corner of survey No. 4 we returned to the beginning point, marked a on the map; from thence we ran the course and distance called for in the original field notes of survey No. 4 to find its northwest corner, which brought us to the point e on the map; thence we ran course called for in original field notes to survey No. 4 the distance called for therein, to-wit, 2890 varas, for the purpose of finding the northeast corner of survey No. 4. At the point thus reached we made a careful search for northeast corner of survey No. 4, but could not find same nor any indication thereof. We then made a careful search for the east or southeast line of survey of No. 4, but could find no trace of same. In making the search we were brought back to the locality where we had searched for the southeast corner of survey No. 4, as above stated.

"Not being able to find the northeast or southeast corners nor the east line of same, as above stated, we then returned to point c shown on the map, where we had driven down the stake as aforesaid, from which point we ran as called for in the deed in evidence from Von Roy to me N. 14 E. 1564 varas, and there we set in the ground a stone and marked it X to indicate the northwest corner of the land I was buying. This stone we set at the point d on the map in evidence, and it it still there with the bearing trees which we then marked and as called for in my deed from Von Roy aforesaid, and same has always been claimed by me as my northwest corner. From the survey made of the line c d as aforesaid and the location of the southwest corner of my land at the stake set as aforesaid at the point c on the map as aforesaid, and the location of the northwest corner of the survey at the stone marked X set in the ground at the point d on the map as

aforesaid, the surveyor said he could write the field notes.

"We did not run out the north line of my land nor the east line, nor did we set a stake for the northeast and southeast corners of my land as called for in the deed from Von Roy to me in evidence. No such stakes were ever set. We then returned home, and from the survey made as aforesaid the surveyor drew the field notes from which my deed was written. I had the words 'more or less' put into the deed, and would not accept it until said words were put in."

In disposing of the case, Judge Gaines said:

"The counsel for plaintiff asked the court to charge the jury in effect that since the undisputed evidence shows that at the date of defendant's deed the southeast line and the southeast corner of the Longavilla survey was not marked upon the ground, the calls in the deed for that line and that corner must give way to the calls for distance. They also requested a charge to the effect that the jury should find a verdict for the plaintiff if the land in controversy was not embraced in the following boundaries: Beginning at the stone called for in Light's deed for his northwest corner and running thence south 76 east 1445 varas; thence south 14 west 1564 varas; thence north 76 west 1445 varas, and thence north 14 east 1554 varas to the beginning. The refusal of each of these instructions is assigned as error.

"We are of the opinion that the charges were properly refused. Ordinarily when there is proof that the calls in a deed are taken from the field notes of an actual survey, a call for distance will control a call for an unmarked line, especially when the circumstances tend to show that the surveyor was unacquainted with the true locality of the line and called for it by mistake. Such were the cases of Gerald v. Freeman, 68 Tex. 201, [4 S. W. 256], and of McCown v. Hill, 26 Tex. 361. In a case of two inconsistent calls of such a character one of them is usually the result of mistake; and when it can be ascertained which is the mistaken call it will be rejected and the other adopted as that expressive of the true intention of the parties. If in the present case, when Light went upon the ground with the surveyor and caused the survey to be made, they had established corners at the points g and f upon the foregoing map as the northeast and southeast corners of the land to be conveyed, then there can be no question but that the calls for the east line and the southeast corner of the original survey should be rejected. That call must be followed which corresponds with the survey as actually made. But the testimony shows that Light and the surveyor did not establish corners at the points indicated. It tends very strongly to prove that the reason why this was not done was because they failed to

find any evidence of the east line and corners of the original survey at the distance called for in its field notes. No corner having been marked or otherwise fixed at the point marked f when the survey was made, though the surveyor ran to that point, the question is, what did the parties to the deed intend? Was it their purpose that the deed should convey all the land lying between the north and south lines as extended eastward to the line and corner of the original survey, or did they intend the east line of the land conveyed should be where the distance called for would place it? We think the intention was to convey the land up to the east line of the original survey. In the light of the circumstance that in surveying the land the east line and corners of the Longavilla survey had been searched for and had not been found, the use of the words 'more or less' following the number of acres stated in the description indicates that the parties to the conveyance intended to convey all the land in the southeast corner of the grantee's tract, and that they were aware that when the east line was established there might be either a deficiency or excess in the quantity. If the distances called for in the deed were to control, the number of acres conveyed were fixed, and the words 'more or less' would be meaningless. The defendant J. W. Light testified that he insisted upon having the words inserted in the conveyance, and they are presumed to have been inserted for some purpose. Besides, the language 'four hundred acres, more or less, taken out of the southeast corner of survey No. 4,' shows that it was the intention that the land should extend to the east as well as the south line of the original survey.

"In view of the undisputed evidence in the case we are of the opinion that the land in controversy passed by the deed from Von Roy to Light. It follows from this conclusion that it is unimportant whether or not the court erred in admitting the testimony of the witness Beck. If error, the plaintiff was not prejudiced by it, because with or without this testimony the only proper result of the trial was a judgment for the defendants. Bowles v. Brice, 66 Tex. 724 [2 S. W. 729]."

In Baker v. Light it is significant that the distance calls were rejected though the surveyor actually surveyed course and distance the south line of the Light land. The distance calls of the north and south boundary lines were rejected because the surveyor did not actually establish corners at the points fixed by course and distance, and to give controlling effect to course and distance would defeat the intention of the parties.

In the present case the field notes of the Yates tract call for connections with eight corners in the east lines of surveys 33, 32, 31, and 30, and for two corners in survey 1, block 178, but none of the corners so called for were established on the ground, monumented or otherwise identified.

In Willoughby v. Long, 96 Tex. 194, 71 S. W. 545, Judge Gaines said:

"The first question to be determined is; Did Glenn's purchase include the entire survey, or was it limited to the 640 acres off the south end of the tract? The plaintiffs in error claim that it embraces the whole survey, while on the other hand the defendant in error contends that the south 640 acres only were included in that purchase. That controversy grows out of the language, descriptive of the land, employed in Glenn's application to purchase. The description of the land applied for is as follows: 'The following land in section No. 23, block No. ――――, in McCulloch County, about 5 miles N. 63 W. from the center of said county surveyed for G. & B. N. Company, Certificate No. 84, beginning at the N. W. corner of survey No. 307 in the name of John Startz; thence north 1900 varas; thence east 1900 varas; thence south 1900 varas; thence west 1900 varas to the place of beginning.' If at the time the application was filed the resurvey had been filed and the excess had been disclosed, then this description standing alone would, as we think, have shown that the intention was to apply only for the 640 acres on the south end of the survey. But the resurvey had not then been made, and the applicant had the right to rely and doubtless did rely upon the original field notes as being correct. There being nothing on their face to disclose an error, and since the lines designated in the application embraced the entire survey as shown by the original field notes, it is not apparent to us that it was not intended to include the whole tract. But the application proper is only a part of the transaction. It amounts to nothing unless accompanied by an obligation for the unpaid balance of the purchase money. When the application proper, with the obligation and oath required by law, have been filed and the first installment of purchase money paid, the right of the applicant is fixed and there is a contract with the State. It is a familiar rule, that, in construing contracts, all the papers which evidence the agreement must be read together, in order to arrive at the intention of the parties. In the obligation given by Glenn, the land purchased is described as 'whole of section 23, block ――――, McCulloch County;' then follows substantially the same description as was given in the application. This shows, we think, that the intention was to purchase the whole survey, and that the sale was a sale of the entire tract. It also appears from the evidence in the case that the language in the application, which creates the sole difficulty in construing it, was that contained in a printed form in the surveyor's office, and that the words 'following land in section No. ――――,' were inserted

in the form so that it would meet the case, whether the purchaser desired to buy either the whole or a part of the section.

"We therefore conclude that the purchase by Glenn included the whole of the survey."

In Brown v. Bedinger, 72 Tex. 247, 10 S. W. 90, it was said:

"The evident intention of the surveyor was to leave no vacancy, and that intention should prevail."

In Moore v. Reiley, 68 Tex. 668, 5 S. W. 618, it was said:

"It was the evident intention of the officers representing the State to include in the locations all the land between the Hanks and Ashmore on the east and the Rutledge on the west; and we are of the opinion that the surveys should be so established."

In Ruth v. Carter-Kelly Lumber Co. (Tex. Civ. App.) 286 S. W. 322, it was said:

"The intention of the surveyor who located section 9 must prevail. Therefore, if he intended to include the land north and west of the Leonard, as it was the evident intent of the state that he should do, then the survey must conform to his intention, and if he made a mistake in assuming the north and south lines of the Leonard to be 950.4 varas, without measuring them, or if an erroneous measurement was made, such a mistake cannot prevail against the intent of the grantor apparent on the face of the grant."

In Davis v. Baylor (Tex. Sup.) 19 S. W. 523, the court says:

"In view of the evidence, we think that the court below was justified in holding that the parties to the last mentioned deed intended to convey all of the land lying between the stone which marks the north end of the division line between lots Nos. 4 and 5 and the true western boundary line of the Parker county survey, wherever that might be ascertained to be. To confine the defendant to the boundaries as contended for by the appellants would require us to entirely ignore the several calls in the deed for the well-known line of the Parker county survey. We think that the call for distance should yield, in order to effectuate the intention of the parties, and that the east and west lines of the lots should be extended from the true west line of the Parker to the line marked by the stone at the northwest corner of lot No. 5, or vice versa. We conclude that the judgment should be affirmed."

In Findlay v. State (Tex. Civ. App.) 238 S. W. 956, Judge Jenkins, upon rehearing, at page 973, said:

"It is evident that the state intended to convey these lands in solid bodies, without any vacancy between any of the surveys. The field notes of the various leagues call for each other, and the maps prepared by the state's surveyors, to which bidders looked, showed that the lines of the surveys were coterminous. It was the intention of the state to so grant the surveys, and of the contractors to so receive them.

"By reason of the fact that several surveyors were doing the work in the field, corners were established on the ground in such manner as to leave vacancies, as stated in our original opinion herein, but in each instance these surveys called for each other. These vacancies have been sold by the Capitol Company, and the parties purchasing them have for many years been in possession of the same, and have made improvements thereon, in ignorance of the mistakes of the state's surveyors, which created these vacancies. We think, under these circumstances, the equitable title to these vacancies has been in the Capitol Company ever since the capitol building was completed. The patents should have embraced these vacancies, and equity regards that as having been done which ought to have been done."

This case involved excessive acreage in grants to the Capitol Building contractors. A writ of error was granted and the case affirmed in 113 Tex. 30, 250 S. W. 651. See, also, Woods v. Robinson, 58 Tex. 655; Lilly v. Blum, 70 Tex. 704, 6 S. W. 279; Boon v. Hunter, 62 Tex. 582; Maddox v. Fenner, 79 Tex. 279, 15 S. W. 237.

We quote with approval from the brief of some of the appellants, as follows:

"It is the general rule that a call for an unmarked adjacent line which may be established with certainty will prevail in case of a conflict with a variant call for distance. Appellee invokes in this case the exception that this rule does not apply where the adjacent line was called for by mistake. It seems to us that the evidence in this case as quoted above shows conclusively that the mistake of the surveyor, Dodd, as shown, was not in calling for the lines of the adjacent Surveys 33 to 30, but his mistake was in the distance that it would take to reach that line. Under appellee's theory, Dodd, under the direction of the Land Commissioner, used an improper method of surveying and construction in determining the position of the east lines and corners of said Sections 30 to 33. If so, his mistake was not in calling for the line that he did call for, but in estimating the distance necessary to reach it. His sole purpose was to find, if he could, the lines and corners of the adjacent surveys to the east and west, north and south, so as to survey and take up all the land lying between said Block 1, I. & G. N. and Surveys 30 to 33, Block 194. That was his dominant purpose, his principal aim, and what he endeavored to do, and that was the reason that he asked for the instructions from the Land Commissioner as to what method to use to locate the eastern lines of Sections 30 to 33. If the Land Commissioner had instructed him to use a different method which would have correctly located the eastern lines of said sections, then

Dodd would have inserted whatever distance was necessary to reach these lines. Therefore there was no mistake in his calls for Sections 35 to 30 inclusive. That was certainly where he was trying to go; that was the point he intended to reach; and that he did intend to reach these lines and corners is shown by the fact that Dodd's field notes of the Yates Survey called eight times of the lines and corners of Surveys 33 to 30 inclusive. As stated above, if the call '308 varas west' is extended 425 varas, then even according to appellee's evidence as to the location of the east lines of said Sections 33 to 30 the remaining calls in Dodd's field notes will follow those lines in all their variations and include all the land which Dodd intended to include between Block 1 I. & G. N., and said Surveys 30 to 33. Dodd knew that there were two methods which might be used to determine the east lines of Sections 30 to 33, one by course and distance from the east line of Block Z, and the other by projecting the lines from the known corners in Block C–3 north to Block 194. When Dodd received the instructions to locate the east lines of said Surveys 30 to 33 from the corners in Block C—3 to the south, from the Commissioner of the General Land Office, he then called for sufficient distance to reach that line if it was properly located as the Commissioner directed. This is shown by the testimony of the witnesses Goodfellow and B. M. Taylor, and is practically undenied by the testimony of Mr. Lea, although Mr. Lea says that he was unable to identify the corners in Block C—3. But Capt. Dodd, in order that there might be no question as to making the west line of the Yates Survey coterminous with the east line of Sections 33 to 30, did not mark the west line of the Yates Survey on the ground, did not run said lines at all, but tied the same to the east lines of Sections 33 to 30, inclusive, by many calls, thus evidencing his plain intention to include all the land within the Yates Survey up to the lines of said Sections 30 to 33, whether located by the construction now contended for by the appellee or that adopted by the Land Commissioner. * * *

"The question, as we understand the authorities, is whether the surveyor would have called for the adjoining survey if he had been advised of its true location; in other words, was it his intention to go to such line and conform his survey thereto. This is not a case of tracing the actual footsteps of the surveyor on the west line of the Yates Survey. He made no actual survey of that line, nor did he mark its boundaries other than by his calls for the east lines and corners of Surveys 33 to 30. Now, according to all the testimony, the east line of Surveys 30 to 33 can be certainly established by one of two methods, the one used by Dodd, by projecting a line north from corners in Block C—3, or if that is incorrect as a matter of law, as appellee contends, then by measurements

from the east line of Block Z. It is well to note here that the appellee is under the necessity of establishing as a fact that the east lines of Surveys 30 to 33 are definitely fixed and can be located on the ground, otherwise appellee seeking to establish a vacancy would be bound to fail. If he is right in his contention that it should be located by course and distance from the east line of Block Z, then it has always been thus definitely fixed and its location merely a matter of measurement. Then we have a case where the primary intention of all the parties to the transaction, including that of the surveyor, is to extend the survey to an unmarked line, but its location not definitely known. The case of Baker v. Light, 80 Tex., 627, covers this situation like a blanket."

Maddox v. Fenner, 79 Tex. 291, 15 S. W. 237, announces the doctrine that in a proper case the call for an unmarked line or corner of an adjacent survey, the position of which can be ascertained with accuracy, will prevail over course and distance. That ruling has been often applied in subsequent cases. Davis v. Baylor (Tex. Sup.) 19 S. W. 523; Waggoner v. Daniels, 4 Tex. Civ. App. 354, 23 S. W. 738, and others.

In this connection also attention may well be called to excerpts from the opinion of Justice Greenwood in Anderson v. Polk (Tex. Sup.) 297 S. W. 219. That case was disposed of upon general demurrer, but it was an action under article 5323, R. S., and is very pertinent upon the right of appellee to have the land described in his petition declared to be vacant, unsurveyed land, not embraced in the boundaries of a prior grant by the state.

That case involved the status of land within the corporate limits of the city of San Antonio which had been exposed by artificial and permanent changes in the channel of the San Antonio river. The position of Anderson was that thereby the land became a part of the public domain, subject to survey and purchase. He applied to the Land Commissioner for a survey. The Commissioner declined to recognize the land as vacant, just as he did in the instant case.

Anderson brought suit against Polk, the surveyor of Bexar county. The city of San Antonio was impleaded. In holding the petition subject to general demurrer, Judge Greenwood, among other rulings, said:

"Bearing in mind that the one obstacle to the survey sought by plaintiff in error, according to his own petition, was the ruling of the Land Commissioner that the land in controversy was not subject to sale by the state, if the Commissioner's ruling would be upheld by the location of the land within the grant from Spain to San Antonio, it must be presumed that the land so lies. * * *

"The action of the Commissioner of the General Land Office, in holding that the land in controversy was titled land, raises the presumption that it was embraced within the

boundaries of a valid grant, which presumption is greatly strengthened, as we have said, by plaintiff in error's allegations and the facts within our judicial knowledge. * * *

"Nor are we concerned here with the character of right or title held by San Antonio under the ancient grant to part of the river bed. It suffices to uphold the action of the courts below in declaring the petition bad on general demurrer to say that the specific facts pleaded by plaintiff were wholly inadequate to overturn the action of the Commissioner of the General Land Office. So long as the commissioner's act appears to have been lawful, no mandamus will issue against the county surveyor."

In the present case the Land Commissioner declined to recognize the alleged vacancy. As shown by the plaintiff's petition, he advised Turner:

"There is not sufficient information on file in this office to warrant advice that any vacancy exists, according to the field notes of adjacent surveys. Accordingly you are advised no vacancy."

Under Judge Greenwood's opinion, it seems to us that in the instant case the construction placed by the Land Commissioner upon what was shown by the records of his office is well nigh, if not wholly, conclusive of the proper interpretation to be placed upon the boundaries of the prior grant to Yates. It is certainly absolutely confirmatory of the view that it was the intention and purpose of the state to grant to Yates all of the land lying between the river surveys and the east line of the surveys to the west in blocks 194 and 178, and that the authorized representative of the state thought such purpose had been accomplished.

Under the authorities, we are of the opinion that, in order to effectuate the plain intention of all the parties, the distance call (west 308 varas) in the field notes of the Yates survey must yield to the calls for the corners in the east lines of surveys 33, 32, 31, 30, in block 194, and survey 1, block 178. As thus construed, they embrace all the land lying between the west line of the river surveys and the east line of the five surveys mentioned.

Before passing finally from discussion of the proper construction to be placed upon the field notes of the Yates tract, attention should be called to certain phases of appellee's brief. While it is never directly and positively so stated in such brief, the inference to be drawn from many statements therein is that Dodd from a point 268 varas north of the southwest corner of survey 61, block 1, I. & G. N. R. R. Co., actually ran upon the ground the call of 308 varas to an east corner of survey 33, block 194. This is the first western call and north line of the Yates tract. It would also be inferred that Dodd actually ran upon the ground from such corner of 33 to the succeeding corners in surveys 33, 32, 31, and 30,

in block 194, and survey 1, block 178, which corners are called for in the west line of the Yates tract.

Dodd did not survey the north, west, and south line of the Yates tract upon the ground. His two reports, particularly the second or final one, upon their face plainly show he merely calculated the distances called for in the north, west, and south lines of the Yates. It was unnecessary for him to actually run those lines because he could by calculation determine those distances from preliminary work previously done upon the ground, particularly the lines which he ran in locating the common line between blocks Z and 194, and the line which he ran from the North West corner of survey 5, in block 194, to a point for the northeast corner of survey 34, block 194, and on 4,520 varas to a point on the west bank of the Pecos river as shown in his first report; and as shown in second report, by a line actually run from the northwest corner of survey 62, river survey, to the northeast corner of survey 34, block 194, "and found it 11 varas north and 422 varas west."

From these lines actually run and other work done in the field and shown in the reports, it was a matter of simple calculation for Dodd to know the distance calls to be inserted in the north, west, and south lines of the Yates survey, and his second report upon its face shows that the calls were based upon calculations, apportioning excess north and south, east and west, as directed by the Land Commissioner. This opinion will not be burdened with quotations from Dodd's reports. It is already unduly prolonged. Suffice it to say that if the reports of Dodd be read showing how he actually did the work, it will affirmatively appear the north, west, and south lines of the Yates survey were not actually run on the ground.

Appellee in his brief also lays much stress upon a monument placed by Dodd to mark the northeast corner of 34, called in the brief "Dodd Reference Monument N.E.34." At one point in the brief it is stated:

"The 'Dodd Reference Monument, N. E. 34' nails down the west line of the Yates Survey according to its course and distance calls contained in its field notes, such that they cannot be extended under any circumstances farther west than its course and distance calls from its well marked east line will take them."

We do not see how this can be successfully asserted when there is no reference in the Yates field notes to such monument or to any line or corner of survey 34. Said survey does not adjoin the Yates land; the so-called Dodd reference monument is about a mile north of the Yates land. Such monument is important only as determining the location of the east line of block 194 according to the instructions of the Land Commissioner to Dodd, and the plaintiff's whole case rests upon the assump-

tion that, as a matter of law, such method of determining such east line is erroneous.

■ The conclusion having been reached that the boundary calls of the grant to Yates, properly interpreted and construed, embrace all of the land lying between the west line of the river surveys and the east lines of surveys 33, 32, 31, and 30, in Block 194, and survey 1, in block 178, it follows that it is all titled land and no vacancy exists subject to be surveyed, under article 5323, R. S. Fitzgerald v. Robison, 110 Tex. 468, 220 S. W. 768; Maddox v. Fenner, 79 Tex. 279, 15 S. W. 237; O'Keefe v. Robison, 116 Tex. 398, 292 S. W. 854; Taylor v. Heirs of Lewelyn, 79 Tex. 96, 14 S. W. 1052; Winsor v. O'Connor, 69 Tex. 571, 8 S. W. 519; Mackey v. Robison, 116 Tex. 373, 291 S. W. 1102; Fielder v. Houston Oil Co. (Tex. Com. App.) 208 S. W. 158; Schnackenberg v. State (Tex. Civ. App.) 229 S. W. 934.

■ Since the patent covers the land in controversy, no one but the state can question its validity or has any right arising out of the fact that there is an excess of the acreage contained in the grant to Yates above what was originally estimated. Fitzgerald v. Robison, 110 Tex. 468, 220 S. W. 768; Mackey v. Robison, 116 Tex. 373, 291 S. W. 1102; O'Keefe v. Robison, 116 Tex. 398, 292 S. W. 854.

■ For the excessive acreage the state may recover the purchase price. Willoughby v. Long, 96 Tex. 194, 71 S. W. 545. Whether it has any other remedy need not be inquired.

It is apparent there is a conflict of interest between the Yates interests and Mrs. Smith and those claiming under her. The Smith interests own surveys 31 and 33, in block 194, and survey 1, in block 178.

■ The land granted to Yates under the Dodd field notes, however construed, conflicts with the Smith interests. For this court to now consider the merits of the claim made by the Smith interests would be to prejudge the merits of the controversy between the respective interests when such issues have not been developed. This is not to be done if it can be avoided. The issues between the Yates interests and Smith interests could not be injected into the present litigation.

■ Under article 5323, R. S., the scope of the inquiry is limited to the determination primarily of whether the land described in the petition is unsurveyed land belonging to the public free school fund. Only when that issue had been answered in the affirmative does the statute authorize the issuance of the writ of mandamus against the surveyor.

■ The primary effect of the statutory action, when successfully maintained, is to first impress the land, as against the adverse claimants, with the status of unsurveyed land belonging to the public free school fund. As respects the parties to the litigation, this feature of the judgment operates as in rem.

■ If it be determined that it is not such land, then the plaintiff's case fails as to all adverse claimants. The judgment in this respect is an entirety. It is indivisible; quasi in rem.

■ In such cases a reversal as to one defendant operates as a reversal as to all defendants. See cases cited 1 Michie, Digest, 976 et seq.

For the reasons stated, the case must be reversed and rendered upon the appeal of certain of the Yates interests, and this operates to reverse and render in behalf of all adverse claimants.

It is therefore unnecessary to consider the merits of the appeal by the Smith interests, and for the reason stated we refrain from doing so. We desire it to be understood that nothing in this opinion is to be considered as authoritative in any litigation now pending or hereafter arising between the Yates interests and the Smith interests. The issues between them are wholly undetermined.

For the purpose of this appeal we have resolved in favor of appellee, Turner, without consideration of their merits, questions of fact and law presented by the various Smith interests.

It is deemed unnecessary to consider the merits of those questions for resolving them in favor of Turner; he nevertheless has no right to have the land declared to be unsurveyed land, for it is embraced within the grant to Yates.

Reversed and judgment here rendered decreeing that the land described in the plaintiff's petition is not vacant, unsurveyed public land belonging to the public free school fund of the state of Texas; that the relief sought by the plaintiff be in all things denied; that the county surveyor Lea and the impleaded adverse claimants, and each of them, be discharged without day and recover their costs of the plaintiff.

Reversed and rendered.